Filed 4/14/15  In re D.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| In re D.S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E062099 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J237707 & J237708) |
| v. | OPINION |
| R.P., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent.

1

On September 25, 2014, the juvenile court denied defendant and appellant R.P.'s (mother) Welfare and Institutions Code[1] section 388 petition without providing an evidentiary hearing. On October 14, 2014, the juvenile court terminated mother's parental rights as to child 1 (born in 2007) and child 2 (born in 2009) (collectively the children). On appeal,[2] mother contends the court erred by denying her section 388 petition and in finding the beneficial parental relationship exception to termination of parental rights inapplicable. We affirm.

FACTUAL AND PROCEDURAL HISTORY

On February 28, 2011, police arrested mother and D.S. (alleged father)[3] (collectively parents) for possession of marijuana and methamphetamine for sale and child endangerment. Plaintiff and respondent San Bernardino County Children and Family Services (CFS) received an emergency response referral that the children were

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Although neither party addresses the issue, we note mother's appeal expressly indicated she was appealing the juvenile court's order terminating her parental rights on October 14, 2014. Nowhere in the appeal does mother indicate her appeal is also based on the juvenile court's denial of her section 388 petition on September 25, 2014. Nonetheless, we will construe the notice of appeal to include the court's order denying her section 388 petition. (*In re Madison* (2006) 141 Cal.App.4th 1447, 1451 [appellate courts may "liberally construe a parent's notice of appeal from an order terminating parental rights to encompass the denial of the parent's section 388 petition provided the trial court issued its denial during the 60-day period prior to filing the parent's notice of appeal"]; Cal. Rules of Court, rule 8.405(a)(3).) Here, mother filed her notice of appeal in propria persona on the same day the juvenile court terminated her parental rights, October 14, 2014; thus, the appeal from the denial of the section 388 petition would have been timely filed if she had expressly indicated she was appealing from that order as well.

[3] Alleged father is not a party to this appeal.

2

living in a home infested with rats, with rat droppings all over the home, and no hot water, food, or diapers. Parents were "storing and engaging in the selling of drugs from the home." There was electric wiring in a flooded area of the garage, which was accessible to the children. The children were dirty and had no shoes.

Mother and alleged father both admitted to smoking marijuana. Alleged father admitted doing so on a daily basis. Parents had a prior substantiated CFS referral for general neglect in 2010. Alleged father had a prior criminal history for driving under the influence, possession of a firearm by a felon, and possession of marijuana for sale.

CFS filed a juvenile dependency petition alleging mother suffered from chronic substance abuse issues (B-2); mother failed to provide adequate food, clothing, shelter, or medical treatment (B-4); mother had failed to adequately protect the children from the conduct of alleged father (B-7); and mother had been arrested for child endangerment and possession of drugs for the purpose of sales, leaving no provision for the children's care (G-9).

On March 3, 2011, the court detained the children, and granted mother visitation of once weekly for two hours upon her release from custody. In the jurisdiction and disposition report filed March 21, 2011, the social worker recommended the children be removed from mother's custody and mother be granted reunification services. Mother had pled guilty to possession of a controlled substance for sale and willful cruelty to a child, and was released on her own recognizance. Alleged father had pled no contest to possession of a controlled substance for sale and was sentenced to 16 months in state prison. The social worker noted, "Both mother and father have a history of substance

3

abuse and father has completed at least one (1) inpatient . . . substance abuse treatment program."

An addendum report dated May 3, 2011, reflected mother had been sentenced to 24 days in county jail, and was placed on four years' probation. Additionally, she was required to attend narcotics anonymous/alcoholics anonymous meetings three times weekly, attend a one-year child abuse treatment program, and submit to regular drug testing. On June 8, 2011, as to mother, the juvenile court dismissed the G-9 allegation, found the remaining allegations true, found the children dependents of the court, removed them from mother's custody, and granted her reunification services. Reunification services for the alleged father were denied because he had never been accorded presumed father status. The juvenile court granted mother visitation twice weekly for one hour and ordered "WRAP" services.

On November 28, 2011, in a status review report, the social worker recommended additional reunification services. Mother had completed her individual therapy requirements. Her therapist recommended a psychological evaluation to assess mother's mental health issues. The therapist stated it had been difficult for mother to talk freely during sessions. Mother had psychotropic medication evaluations and psychiatric assessments on May 20 and June 29, 2011.

Mother had been offered outpatient substance abuse services and testing. The substance abuse case manager "reported that mother was not progressing on internalizing treatment objectives with little participation nor has a sober support system." Mother had missed eight days of treatment.

The social worker had referred mother to a perinatal program. On October 12, 2011, it was reported that mother had "opened up 'a little' in group, but overall is not demonstrating skills necessary to maintain a program of recovery." Since being referred to a substance abuse aftercare program, the staff reported mother "has shown minimal progress and has no social support system. She did not complete the program successfully." Mother was in compliance with the requirement that she attend a 12-step program. She had tested negative for controlled substances on eight occasions.

Mother reported she is bipolar, schizophrenic, and has depression for which she was on medication and is seeking Social Security disability. She indicated she would provide a letter of confirmation from a psychiatrist to confirm her diagnoses. Mother was unemployed.

The social worker reported, "Mother has not completed services and does not appear to have benefited from services offered. She also does not have appropriate housing. The relationship with the alleged father is a concern and whether she can provide ongoing safety [for] the children is questionable." Alleged father had been released on probation on October 30, 2011. He reported he did not have a problem with drugs and did not need services.

Mother visited the children twice a week for an hour: "Visits usually consist of the children fighting and throwing toys at each other. [Child 1] calls her mother by her first name and mother has to keep reminding her that she is their mother. In one particular visit, the mother told [child 2] not to forget who his mother was as she brought

5

him into the world and can take him out. She has also threatened to spank the children." The social worker addressed the comments with mother, but mother said she was joking.

The social worker further reported, "Mother has also threatened the children stating that she would not attend the visits if they did not listen. Mother also discusses the alleged father with [child 1] even though she was advised not to . . . . The foster parent has stated that [child 1] at times disclosed that her father used to hit her." "The children have also been observed to not want to interact with their mother. Mother at times seems disconnected from the children and often appears to lack enthusiasm when seeing the children."

On December 8, 2011, the juvenile court found mother had made "moderate" progress and ordered additional reunification services. In the status review report filed April 17, 2012, the social worker recommended mother receive additional reunification services. The social worker noted, "mother continues to be engaged in services and appears to be making [a] substantial amount of progress on her case plan. Mother has struggled to show benefits of services, but seems to be taking services more seriously. Mother needs more time to show a benefit."

The social worker reported, "Mother was terminated from Juvenile Dependency Drug Court on December 14, 2011, for failure to make progress." "Mother was also offered psychotropic medication evaluating/monitoring. Mother has stated that she feels she does not need any medication. She stated that she will provide a letter from her doctor to verify this." "On December 12, 2011, [mother] was referred to the aftercare program at St. John of Gods. On April 6, 2012, [the social worker] spoke to [mother's]

6

counselor by phone and was advised that mother is in compliance and has tested negative for all drug tests."

Mother reported moving in with alleged father's aunt, sister, and the sister's three children: "Mother reported that the children could be returned to her at this residence." However, one of the adults had an active traffic warrant, which the social worker informed mother would have to be cleared before returning the children to her care at that address.

Mother informed the social worker that she was together with alleged father and working on their relationship: "The concern is that he has not taken responsibility for his actions and does not believe he needs reunification services." Nonetheless, the social worker opined, "Mother has made progress and appears to be taking a more active role in showing that she can benefit from services. Mother needs to continue attending and showing that she can benefit. She also needs to provide suitable housing and show that she can provide [for the] safety of the children from the [alleged] father. She needs to realize that the risk still exist[s] if she continues to associate with the [alleged] father at this time."

Regarding visitation, the social worker observed, "Mother visits the children twice a week for one (1) hour at each visit. Mother receives Wraparound services along with the children. Mother has become more consistent in visiting and arriving on time. Mother does struggle with setting boundaries and disciplining the children when they are being unruly." Mother began parent-child interaction therapy (PCIT) with child 1 in

February 2012. The therapist reported mother was doing well and actively participating. Mother was scheduled to begin PCIT with child 2 on April 10, 2012.

On April 27, 2012, the juvenile court found that mother had made substantial progress, and approved a reunification plan. Mother was ordered to participate in the plan. In the August 28, 2012 status review report, the social worker recommended the children be returned to mother's home with the dependency continued. The social worker reported, "Mother has made great strides and has shown that she has benefitted from services offered." Mother was taking Wellbutrin, Lamictal, and Latuda for a diagnosis of schizophrenia. She had previously been off medication since June 2011.

Mother continued to be involved in the "Wraparound" program and PCIT. The therapist reported mother was doing well and actively participating. Mother had successfully completed outpatient substance abuse aftercare services including negative drug testing. However, the social worker noted, "Mother has not provided proof of attending a 12-step program since completing the substance abuse [aftercare] program on July 8, 2012." Mother's residence with the paternal aunt had been cleared. Mother visited with the children twice weekly for two hours each time: "Mother does miss on average one visit a month due to unreliable transportation with family members. But for the most part she regularly attends. When she does attend she is on time and attentive to the children's needs."

On August 28, 2012, at the 18-month review hearing, the juvenile court ordered mother to provide evidence she was participating in a 12-step program. The court found mother had made substantial progress, returned the children to mother's custody,

8

continued the children as dependents of the court, and approved a family maintenance plan.

In the February 28, 2013 status review report, the social worker reported that "[s]ince the children were returned home to mother on August 28, 2012, she has lacked motivation and [has] not followed through with services offered." Further, "[a]s of February 8, 2013, the Wraparound team and [social worker] agreed to have mother's case closed as mother missed Wraparound appointments." Mother tested positive for marijuana on September 11, 24, and October 2, 2012, and failed to appear for a drug test on December 17, 2012. Mother tested negative on November 14, 2012, January 4, 15, and February 6, 2013.

The social worker noted that on "January 31, 2013, a child abuse referral came in stating that the mother left Victor Valley Hospital with her son [child 2] against medical advice. [Child 2] was diagnosed with pneumonia and the doctor was recommending an IV antibiotic. The doctor was also recommending that the child stay in the hospital for a few days." At the direction of the social worker, mother later returned to the hospital with child 2, where he was diagnosed with bronchitis. Mother had been attending 12-step meetings. Alleged father was now living next door to mother.

Mother failed to show at the hearing on February 28, 2013. The juvenile court ordered mother "to test today with the understanding that if she fails to test today or refuses, that counts as a positive." The court later agreed to give mother more flexibility if the attorney or social worker could not reach her that day. The court ordered parents attendance at the next hearing.

In an addendum report filed March 8, 2013, the social worker reported she had been unable to make contact with mother in order to comply with the court's order at the last hearing that mother complete a drug test. However, mother had last tested negative on February 22, 2013.

At a hearing on March 13, 2013, at which mother was present, the court ordered mother to drug test that day.[4] Mother had moved to another city; alleged father had again moved next door to mother.

On June 11, 2013, CFS filed a subsequent and supplemental juvenile dependency petition reiterating the previous allegations: mother suffered from chronic substance abuse issues (B-2); mother failed to provide adequate food, clothing, shelter, or medical treatment (B-4); and mother failed to adequately protect the children from the conduct of alleged father (B-7). CFS added allegations, as to mother, that she had been arrested again on June 4, 2013, for willful cruelty to a child and possession of drugs for sale (G-9), and she had failed to comply or make progress with family maintenance services (S-1). CFS recommended removal of the children from mother's custody. At the detention hearing on June 12, 2013, mother submitted on the report. The juvenile court detained the children and ordered mother to submit to random drug tests.

In the jurisdiction and disposition report filed July 3, 2013, the social worker reported that during "the 10 months the children have been in the mother's care, mother has not followed through with her case plan and continues to make excuses for not

_____

[4] There is no indication in the record as to whether mother complied with the order.

10

completing her services." The social worker noted that mother "continues to use drugs, which places the children at risk of harm. Also the mother has allowed the alleged father to spend time with the children unsupervised." Further, "mother has not been able to sustain sobriety even though she has had multiple treatment episodes."

Mother requested mediation. On July 8, 2013, the court referred the matter to mediation. On August 2, 2013, the social worker reported that mother "is out of statutory time to reunify with the children. . . given that the children were initially removed from her care in February 2011." The social worker recommended the juvenile court terminate mother's reunification services. Mother failed to appear for mediation. On August 15, 2013, the juvenile court found the allegations in the subsequent and supplemental petition true, but continued the matter for disposition.

In an addendum report filed October 10, 2013, the social worker recommended returning the children to mother's custody with family maintenance services. The social worker observed, "The prognosis for this family to successfully complete a family maintenance program is good. Mother is very appropriate in her interaction with the children and demonstrates above average parenting abilities. Mother has been very cooperative with CFS since her release from jail and has not exhibited any signs of inappropriate behavior. Mother submitted to random drug screenings indicating negative results and completed a parenting class."

On October 15, 2013, the social worker reported, "Although mother did provide negative drug tests as well as completion of parenting class as asked by CFS, mother was arrested on October 11, 2013, for receiving stolen property and is currently incarcerated."

11

The social worker further noted, "Prior to the children being removed on June 12, 2013, mother was given eleven (11) months of Family Maintenance Services and is continuing to make inappropriate decisions. With the children not being returned at this time, mother exceeded her time limit with [CFS]." On the same date, the juvenile court removed the children from mother's custody, terminated mother's reunification services, and ordered that mother continue to receive services under a permanent planning program.

In the status review report filed April 11, 2014, the social worker recommended the juvenile court terminate mother's parental rights. The social worker observed mother had "finished her outpatient treatment program and it was reported she wanted to stay in the program longer. Mother is also testing negative on her random drug test[s], however it is believe[d] that mother is using a drug called Spice as evidence[d] by her demeanor during the visits. It has been reported that Spice does not show up on a drug test however the effects [are] the same as being under the influence of marijuana." Mother had completed a parenting class.

Mother had been visiting consistently with the children once weekly for one hour, missing only one visit. During the visits, the children would become upset and hold onto the foster parent's leg. The social worker opined, "The children do not appear to have a bond with mother." The social worker reported, "Mother does not know how to engage or have any long periods of interaction with the children. Mother is very quiet and does not appear to be very firm with the children." On April 18, 2014, the juvenile court reduced mother's visitation to once monthly for one hour.

In the August 11, 2014 section 366.26 report, the social worker recommended the court find the children adoptable and terminate mother's parental rights. Mother had been visiting with the children once a month; however, "[a]t the visits, the children are not excited to see the mother but are interested in the games she brings. [Child 2] will ask when the visit [will be] over and [the children] do not have a problem with saying good-bye to their mother."

The children had resided with the prospective adoptive parent since November 21, 2013. The social worker observed, "The children appear to have made a positive adjustment to the current placement and appear to have a strong emotional attachment with the current caregiver." "The children appear to be happy, and are thriving in this adoptive family situation." The prospective adoptive parent "appears as a stable, strong, nurturing, honest, and dependable individual. She believes that she is the best parent for these children because she has loved and cared for them since they were placed with her. She stated her intention to raise them as her own children. The children obviously love and enjoy her and both of them call her 'Mommy.'"

On September 24, 2014, mother filed a section 388 petition naming only child 1. Mother was apparently requesting reinstatement of reunification services: "Please give me another chance at being a mom to my kids. I'm not perfect. I did make mistakes in my life, but I'm . . . different now." Mother alleged as changed circumstances that she now had "a place to bring my kids to . . . live. I've done every requirement that the court has asked of me. I've done parenting, substance abuse, and I am testing negative." She alleged reinstatement of reunification services would be better for the children because "I

13

feel it's best for my kids to be home with their mother." The next day, the juvenile court denied the petition without a hearing because the request did not state new evidence or a change of circumstances and there were "[n]o attachments or other evidence of the completion of programs or testing."

On October 14, 2014, the juvenile court held the contested section 366.26 hearing. Mother testified that the children had lived with her until they were initially detained at the ages of two and three. The children were returned to her for a year during the instant dependency proceedings. During the time mother had custody, she had provided their primary care.

Mother testified that since the children had been removed, she had attended every visit with them. During the visits, "[w]e play games. I read to them. Watch movies, color, or I just interact with them while they are playing with their toys." The children are happy and run to her at the beginning of visits and give her hugs. They call both the prospective adoptive parent and mother "mom." At the end of visits the children hug mother, grab her, hold her, tell her they love her, and do not want to let her go.

After a lengthy restatement of the facts of the case, the juvenile court noted it did "not see [a] beneficial relationship between the children and [mother] based on the report . . . . While I understand that [mother] loves her children and wants a second chance, the Court is finding that it's in the best interest of the children to terminate parental rights and follow the recommendation as set forth in the report." The court expressly found the parental bond exception to termination of parental rights did not apply. The court found the children adoptable as "they are strongly and emotionally

14

attached to the . . . prospective adoptive parent[], who [has] expressed a desire to legalize the parental relationship with the children through adoption." It found termination of parental rights would not be detrimental to the children. The court terminated mother's parental rights.

DISCUSSION

A. Section 388 Petition.

Mother contends the juvenile court abused its discretion in denying her a hearing on her section 388 petition. We disagree.

"To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.) "Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' [Citation.] The prima facie showing is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.] In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.] The petition must be liberally construed in favor of its sufficiency. [Citations.]" (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.)

"We review a summary denial of a hearing on a modification petition for abuse of discretion. [Citation.] Under this standard of review, we will not disturb the decision of the trial court unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re A.S.* (2009) 180

15

Cal.App.4th 351, 358.) Any error by a juvenile court in denying a hearing on a section 388 petition may be deemed harmless where the petitioner fails to identify any additional evidence the petitioner could have presented at an evidentiary hearing that would have established a right to reunification services. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1161-1165.)

Chronic substance abuse is generally considered a serious problem and, therefore, is less likely to be satisfactorily ameliorated in the brief time between termination of services and the section 366.26 hearing. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 686 [no abuse of discretion in denying a § 388 petition where mother established only a 372-day period of abstinence]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 ["seven months of sobriety since . . . relapse . . . , while commendable, was nothing new"].)

Here, one of the original bases for detaining and removing the children was the fact that mother had a chronic substance abuse problem. The initiating incident was mother's arrest for possession of a controlled substance for sale. Mother pled guilty to possession of a controlled substance for sale.

Yet even early on, it was reported that mother was not progressing well in her drug treatment programs. Since being referred to a substance abuse aftercare program, the staff reported mother did not demonstrate skills necessary to maintain a program of recovery, had shown minimal progress, and had no social support system. Mother had missed eight days of treatment. She did not complete the program successfully. Mother

16

was terminated from the juvenile dependency drug court for failure to make progress. More than a month after completing a substance abuse aftercare program, mother had not provided proof of attending a 12-step program.

After the children were returned to mother's custody, her "Wraparound" program services were terminated as she had missed appointments. Mother tested positive for marijuana on three occasions and failed to show for testing on another date. Mother failed to complete a subsequent court ordered drug test. Mother was subsequently arrested again for willful cruelty to a child and possession of a controlled substance for sale. As the social worker observed, "mother has not been able to sustain sobriety even though she has had multiple treatment episodes." Later still, it was suspected mother was using a mind-altering substance, which would not appear on drug tests.

At the time of mother filing her section 388 petition, on September 24, 2014, her last documented negative drug test was from March 27, 2014. Although mother alleged in her petition that she was "testing negative," nothing in the petition or the record (even in subsequent proceedings) demonstrated this was true. Even if mother had documented subsequent negative drugs tests, this would amount only to "changing," not "changed" circumstances. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [recent completion of drug treatment and sobriety, where parent had a history of relapses and chronic substance abuse problems, is not a changed circumstance warranting § 388 relief].) Moreover, any error in failing to grant mother a hearing on her petition was harmless because mother failed to identify any additional evidence she could have presented at an evidentiary hearing that would have established a right to reunification services. The court acted

17

within its discretion in denying mother a hearing on her section 388 petition based on her failure to allege a prima facie case of changed circumstances.

B.  Beneficial Parental Relationship Exception.

Mother contends the juvenile court erred in declining to apply the beneficial parental relationship exception to termination of her parental rights.  We disagree.

Once reunification services have been terminated and a child has been found adoptable, "adoption should be ordered unless exceptional circumstances exist."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)  Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  A beneficial relationship is established if it "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'"  (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  The parent has the burden of proving termination would be detrimental to the child.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207.)

"'[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]"  (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

18

"[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; accord, *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights . . . . [Citation.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)

Although CFS concedes mother visited regularly with the children, mother failed to demonstrate that termination of her parental rights would be detrimental to the children. Early on, visits with the children were chaotic. Child 1 had to be reminded not to call mother by her first name, mother threatened the children with physical discipline and a refusal to visit with them in the future, the children at times indicated no desire to interact with mother, and mother often seemed disengaged with the children. During subsequent visitation, mother continued to struggle with maintaining discipline. Later visits found the children upset with having to visit with mother and holding on to the prospective adoptive parent's leg. The children were not excited to see mother. During visitation, child 2 would ask when the visits would end, and the children did not have a problem saying goodbye to mother when the visits ended.

The social worker opined, "The children do not appear to have a bond with mother." The juvenile court's findings reflect the court found the social worker's reports

19

credible and disbelieved mother's testimony regarding her bond with the children. Moreover, the children were strongly bonded with the prospective adoptive parent. The juvenile court's findings that there was no beneficial relationship between mother and the children, that the children were strongly bonded to the prospective adoptive parent, and the beneficial parental bond exception to termination of parental rights was not applicable were supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.